UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

RYAN G. CAINE,

                     Plaintiff,

  v.                                                                        Case No. 24-cv-822-pp

YVONNE EKONOMOU, *et al.*,

                     Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO APPOINT COUNSEL (DKT. NO. 5) AND SCREENING COMPLAINT UNDER 28 U.S.C. §1915A**

---

Plaintiff Ryan G. Caine, who is incarcerated at the Wisconsin Resource Center and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, screens his complaint, dkt. no. 1, and resolves his motion to appoint counsel, dkt. no. 5.

**I.    Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 2)**

The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with his case without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1).

1

He then must pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On July 3, 2024, the court ordered the plaintiff to pay an initial partial filing fee of $11.77. Dkt. No. 7. The court received that fee on July 22, 2024. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay remainder of the filing fee over time in the manner explained at the end of this order.

**II.    Screening the Complaint (Dkt. No. 1)**

    A.    Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts,

accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cnty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. County of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.  The Plaintiff's Allegations

The plaintiff alleges that shortly after he arrived at Dodge Correctional Institution on March 13, 2023, prison staff diagnosed him with several mental health conditions including bipolar 1, a mood disorder. Dkt. No. 1 at ¶¶12, 13-14. The plaintiff states that he was prescribed medications including Quetiapine and Bupropion. Id. at ¶15.

On May 2, 2023, defendant Yvonne Economo, a PSU (psychological services unit) staff member, allegedly abruptly discontinued the plaintiff's

3

prescriptions for Quetiapine and Bupropion. Id. at ¶16. The plaintiff states that the abrupt discontinuation of these medications caused withdrawal symptoms including "lack of clear thinking, inability to control muscle movements and extreme fidgeting and anxiety." Id. at ¶¶17-18. He alleges that the PSU was contacted to see if the plaintiff's original medication could be reinstated, but it was not reinstated and no reason was given why the medication was stopped. Id. at ¶19. He allegedly was prescribed another medication to calm him down, but that medication had the opposite effect and increased his anxiety. Id. at ¶20. The plaintiff states that he began to have panic attacks and hear voices in his head. Id. at ¶22. He asserts that on May 19, 2023, he again sought help from the PSU, but that he didn't receive any meaningful help, which led him to injure himself by banging his head on the cell door. Id. at ¶23.

The plaintiff alleges that he was taken to "observation," where defendant Jenny Caylor, a staff psychologist, ordered that he be restrained to a table for sixteen hours. Id. at ¶24. He allegedly continued to suffer from Quetiapine withdrawals which caused "mental decomposition." Id. at ¶26. The plaintiff alleges that on May 20, staff informed him that he would be taken from observation status to the health services unit (HSU) for a nurse to take his vitals and conduct an EKG test. Id. at ¶27.

Three officers who are not defendants allegedly arrived to escort the plaintiff to the HSU; defendant Captain Lana Hartzheim was there in a supervisory presence. Id. at ¶28. The plaintiff states that the officers placed him in hand and leg restraints without issue but that his movement was

4

cumbersome due to the withdrawal symptoms and mobility issues/neuropathy with his feet. Id. at ¶¶29-30. The plaintiff says that as he was being escorted, he abruptly stopped because of "a lack of control and discomfort in his legs and feet. Id. at ¶31. The plaintiff states that the officers told him to keep walking; he allegedly responded that he couldn't walk, started to collapse to the floor, requested a wheelchair and complained of chest pains. Id. at ¶¶32-33, 35. The officers allegedly offered little help and insisted that the plaintiff walk. Id. at ¶36. The plaintiff states that he collapsed and "fully lost control of his legs." Id. at ¶38. Defendant Hartzheim allegedly refused to call for a wheelchair or "emergency help." Id. at ¶40. The plaintiff states that Hartzheim became angry and ordered the plaintiff to get up and walk, which the plaintiff could not do. Id. at ¶41. Instead of helping the plaintiff by getting a wheelchair, Hartzheim allegedly got a restraint chair, which was punitive. Id. at ¶43. The plaintiff states that he was then wheeled to the HSU. Id. at ¶44.

The plaintiff avers that when he arrived in the HSU, he was traumatized and could not coherently answer the nurse's questions. Id. at ¶45. The nurse allegedly had him place a bag over his mouth to breathe because he was hyperventilating. Id. at ¶46. The plaintiff states that the nurse abandoned the idea of giving plaintiff an EKG and he was taken back to his cell via the restraint chair. Id. at ¶48.

The plaintiff alleges that when they arrived at his cell, the officers could not get the restraints off the plaintiff because he could not stand. Id. at ¶49. He states that the officers became frustrated with him and he "was finally roughly

5

placed in a corner by a concrete slab." Id. at ¶¶50-51. The plaintiff avers that Hartzheim then tasered the plaintiff as the plaintiff lay on the floor in a fetal position while the plaintiff hollered from the pain. Id. at ¶¶52-54. Hartzheim then allegedly threatened the plaintiff by putting her taser on his back and forced him to a standing position while his restraints were removed. Id. at ¶¶55-56. The plaintiff alleges that Hartzheim signaled to the sergeant to close the door and as it closed, Hartzhein allegedly pulled the tether connected to the plaintiff as hard as she could, causing the plaintiff to flip in the air and land on his head. Id. at ¶¶57-58. The plaintiff's head allegedly was injured but he was not given any medical or psychological treatment. Id. at ¶¶59, 61.

The plaintiff alleges that on May 23, 2023, he was removed from observation to prepare to transfer to Redgranite Correctional Institution. Id. at ¶62. He states that he "was in no shape mentally to travel, but the psych staff did nothing to stop the transfer." Id. at ¶63. Caylor allegedly was responsible for not stopping the transfer. Id. at ¶64.

The next day—May 24, 2023—the plaintiff allegedly transferred to Redgranite. Id. at ¶65. He states that on the bus ride there, he experienced a "negative mental health episode, decomposition[,]" began to display bizarre behavior and seemed to be under great distress. Id. at ¶¶66-67. The plaintiff alleges that when he arrived at Redgranite, he still was in a state of mental imbalance, and he lay down and licked the floor. Id. at ¶¶68-70. Redgranite staff allegedly recognized that the plaintiff was having some form of mental decomposition, and he was placed in observation. Id. at ¶71. The plaintiff

alleges that on May 26, 2023, staff took him to the HSU for "a current EKG reading." Id. at ¶74. He states that the results were irregular, and he was rushed to a medical center where he spent three days in the intensive care unit for "elevated creatine kinase and dehydration[,] among other things." Id. at ¶¶74-75. The plaintiff allegedly returned to Redgranite on May 30, 2023 and was placed back in observation. Id. at ¶76.

The plaintiff claims that Hartzheim used excessive force when she allegedly tasered him and pulled the tether as hard as she could. Id. at ¶¶78-79. He also claims that Hartzheim demonstrated negligence in violation of Wisconsin state law when she allegedly refused to get a wheelchair for the plaintiff, did not call a mental health professional to assist in calming the plaintiff and when she failed to call for medical and mental health help after the plaintiff injured his head. Id. at ¶¶80-82.

The plaintiff claims that Caylor violated his rights under federal and state law "by failing to initiate a stop of [the plaintiff's] transfer while [he] was in the midst of a mental crisis and in no shape to travel." Id. at ¶83. He also claims that Ekonomou violated his constitutional rights when she allegedly abruptly stopped his medication. Id. at ¶84.

Finally, the plaintiff claims that defendants Kevin Carr and Warden Jason Benzel showed deliberate indifference when they failed to train and supervise the other defendants and when they fail to act to correct the events concerning this case. Id. at ¶¶85-86.

7

The plaintiff seeks declaratory relief, compensatory damages and punitive damages. Id. at ¶¶87-89.

C. Analysis

To state a claim for excessive use of force under the Eighth Amendment, a plaintiff must allege that a defendant applied force maliciously and sadistically to cause harm rather than in a good faith attempt to maintain or restore discipline. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992); Rice ex rel. Rice v. Corr. Med. Servs., 675 F.3d 650, 668 (7th Cir. 2012). Factors relevant to a defendant's mental state include the need for force, the amount of force used, the threat reasonably perceived by officers, efforts made to temper the severity of the force, and the extent of injuries caused by the force. Whitley v. Albers, 475 U.S. 312, 321 (1986); Rice, 675 F.3d at 668. A "prisoner need not show a 'significant injury' in order to have a good claim under the [E]ighth [A]mendment, if a guard inflicted pain maliciously or sadistically." Guitron v. Paul, 675 F.3d 1044, 1046 (7th Cir. 2012) (citing Hudson, 503 U.S. at 7).

The plaintiff has alleged sufficient facts to allow him to proceed on an excessive force claim against Hartzheim for allegedly unnecessarily tasering him while he lay in his cell in the fetal position and for allegedly yanking on the tether which caused the plaintiff to fly in the air and land on his head. The court will exercise supplemental jurisdiction over the plaintiff's state law negligence claims against Hartzheim. See 28 U.S.C. §1367(a).

Prison officials and medical staff violate the Eight Amendment's prohibition on cruel and unusual punishment when they act with deliberate indifference to an incarcerated individual's serious medical needs. Rasho v. Elyea, 856 F.3d 469, 475 (7th Cir. 2017) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual was deliberately indifferent to that condition." Id. (quoting Petties v. Carter, 836 F.3d 722, 727-28 (7th Cir. 2016)).

A serious mental illness, like any serious medical condition, requires treatment appropriate to the situation. See Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001). At this early stage, the plaintiff has alleged sufficient facts to allow him to proceed on an Eighth Amendment claim against Caylor for allegedly not stopping his transfer to Redgranite. The plaintiff may also proceed against Caylor on a negligence claim under Wisconsin state law. The plaintiff also has alleged sufficient facts to state an Eighth Amendment claim against Ekonomou for allegedly abruptly stopping his medication.

Finally, the plaintiff claims that Carr and Benzel violated his rights based on their failure to properly train and supervise the other defendants. To hold an individual defendant liable under §1983, that defendant must be personally responsible for the constitutional violation. Rasho v. Elyea, 856 F.3d 469, 478 (7th Cir. 2017) (citing Childress v. Walker, 787 F.3d 433, 439 (7th Cir. 2015)). The plaintiff has not stated a claim against Carr or Benzel because he alleges

9

that they are responsible only based on their positions as supervisors. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). The court will dismiss Carr and Benzel.

### III. Plaintiff's Motion to Appoint Counsel (Dkt. No. 5)

The plaintiff has filed a motion asking the court to appoint him counsel. Dkt. No. 5. He states that his imprisonment will greatly limit his ability to litigate, that the issues involved in the case are complex and that he has limited access to the library. Id. at 1. The plaintiff also states that while currently he is under the care of psychologists and takes antipsychotic medication, he routinely has bouts of mental illness. Id. at 2. He also states that he has "Attention Deficit Hyper Disorder (ADHD)." Id.

In a civil case, the court has discretion to recruit a lawyer for individuals who cannot afford to hire one. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866-67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" Eagan v. Dempsey,

987 F.3d 667, 682 (7th Cir. 2021) (quoting Pruitt v. Mote, 503 F.3d 647, 654-55 (7th Cir. 2007)). And, given the scarcity of *pro bono* counsel resources, the court may also consider the merits of a plaintiff's claim and what is at stake. Watts v. Kidman, 42 F.4th 755, 763-64 (7th Cir. 2022).

To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Authority, 930 F.3d 869, 871 (7th Cir. 2019). "This is a mandatory, threshold inquiry that must be determined before moving to the second inquiry." Eagan, 987 F.3d at 682. To demonstrate he satisfied the first prong, the plaintiff must show he contacted at least three lawyers and provide the court with (1) the lawyers' names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyer; and (4) the lawyers' responses.

"The second inquiry requires consideration of both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate those claims." Eagan, 987 F.3d at 682. When considering the second prong, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." Pennewell v. Parish, 923 F.3d 486, 490 (7th Cir. 2019). The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." Id. This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." Id. at 490-491. The court "must consider the plaintiff's

11

literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other characteristics that may limit the plaintiff's ability to litigate the case." Id. at 491. In situations where the plaintiff files his motion in the early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." Pickett, 930 F.3d at 871.

The plaintiff has shown that he made a reasonable effort to find a lawyer on his own. But this case is at a very early stage. Along with this order the court will provide the plaintiff a guide with information about discovery and other topics he may find helpful in litigating the case. The next step is that the court will order service of the complaint on the defendants. Once the defendants have answered the complaint, the court will issue a scheduling order setting deadlines for the parties to exchange evidence relevant to the plaintiff's claims (in other words, to engage in and complete discovery) and, if appropriate, to file motions for summary judgment. The scheduling order will give the plaintiff more information and procedural rules relevant to conducting discovery and responding to a motion for summary judgment. Based on the documents the plaintiff has submitted so far, he appears capable of representing himself through these steps. If, as the case progresses, circumstances arise that make it more difficult for the plaintiff to represent himself, the plaintiff may renew his motion. The court will deny the plaintiff's motion to appoint counsel without prejudice (which means that he can renew it at a later stage in the case).

**IV. Conclusion**

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DENIES WITHOUT PREJUDICE** the plaintiff's motion to appoint counsel. Dkt. No. 5.

The court **DISMISSES** defendants Jason Benzel and Kevin Carr as defendants.

Under an informal service agreement between the Wisconsin Department of Justice and this court, the court will electronically transmit a copy of the complaint and this order to the Wisconsin Department of Justice for service on defendants Yvonne Ekonomou, Jenny Caylor and Lana Hartzheim. Under the informal service agreement, the court **ORDERS** those defendants to file a responsive pleading to the complaint within sixty (60) days.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$338.23** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

13

The court will send a copy of this order to the director of the Wisconsin Resource Center, where the plaintiff is confined.

The court **ORDERS** that the parties must not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and filing dispositive motions.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[1] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the Clerk of Court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody

---

[1] The Prisoner E-Filing Program is mandatory for all individuals incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing this case without further notice.

The court will include a guide prepared by court staff to address common questions that arise in cases filed by prisoners. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that the plaintiff may find useful in prosecuting his case.

Dated in Milwaukee, Wisconsin, this 19th day of February, 2025.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**