RYAN G. CAINE,

                    Plaintiff,

        v.                                        Case No. 24-cv-822-pp

YVONNE EKONOMOU and
LANA HARTZHEIM,

                    Defendants.

**ORDER DENYING DEFENDANT HARTZHEIM'S MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 42) AND GRANTING DEFENDANT EKONOMOU'S
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 47)**

Plaintiff Ryan G. Caine, who previously was incarcerated and is representing himself, filed a complaint under 42 U.S.C. §1983. The court allowed the plaintiff to proceed on claims that the defendants violated his rights under federal and state law when he was confined at Dodge Correctional Institution. Dkt. No. 9. Defendants Yvonne Ekonomou and Lana Hartzheim, who are represented by separate counsel, each have filed a motion for summary judgment. Dkt. Nos. 42, 47. Three days after the defendants filed their motions for summary judgment, the court ordered the plaintiff to respond to the motions by April 6, 2026; the court ordered that if, by that date, the plaintiff did not either respond or file an explanation for why he could not timely respond, the court would resolve the defendants' motions without input from the plaintiff. Dkt. No. 51. The court has not received the plaintiff's

1

response. This order grants defendant Ekonomou's motion for summary judgment[1] and denies defendant Hartzheim's motion for summary judgment.

## I.  Procedural Background

The court screened the complaint under 28 U.S.C. §1915A and allowed the plaintiff to proceed on the following claims: (1) an Eighth Amendment excessive force claim against Hartzheim for allegedly unnecessarily tasering the plaintiff while he lay in his cell and for subsequently yanking on a tether causing the plaintiff to flip over and land on his head; (2) a Wisconsin state law negligence claim against Hartzheim for allegedly refusing to get the plaintiff a wheelchair when he couldn't walk, not calling a mental health professional to assist in calming him and not calling for mental and medical help after the plaintiff injured his head; (3) Eighth Amendment medical care and Wisconsin state law negligence claims against former defendant Jenney Caylor for allegedly not stopping the plaintiff's transfer to Redgranite Correctional Institution; and (3) an Eighth Amendment medical care claim against Ekonomou for allegedly abruptly stopping the plaintiff's medication. Dkt. No. 9 at 7-9.

---

[1] On May 6, 2026, the court received from counsel for defendant Ekonomou a letter asking the court to dismiss the case and enter judgment in her client's favor. Dkt. No. 54. The letter stated that the plaintiff had not filed his opposition materials by the deadline the court had set, and it referenced Civil Local Rule 41(c), Civil Local Rule 56(b)(9) and Fed. R. Civ. P. 41(b) (E.D. Wis.). Id. A letter is not the appropriate way for a party to ask a court to rule on an issue. In Section II(E) of its "Tips for Parties Practicing Before Judge Pepper," the court explains the reason for this, and ends by stating, "So—**file motions or notices, not letters.**" https://www.wied.uscourts.gov/judges/pamela-pepper, "Tips for Practicing Before Judge Pepper." The court has taken no action on this letter.

On January 23, 2026, the court granted Hartzheim's and Caylor's motion for partial summary judgment on exhaustion grounds. Dkt. No. 41. The court dismissed without prejudice the plaintiff's Eighth Amendment excessive force claim against Hartzheim based on allegations that she yanked on the tether, causing him injury; his Eighth Amendment claim against Caylor based on allegations that she did not prevent his transfer to Redgranite; and his state law claims against Hartzheim and Caylor. The court dismissed Caylor as a defendant. Id. at 11. It denied Ekonomou's motion for summary judgment on exhaustion grounds. Id.

The following claims remain: The plaintiff's Eighth Amendment claim against Ekonomou for allegedly abruptly stopping his Wellbutrin medication and the plaintiff's Eighth Amendment claim against Hartzheim for allegedly unnecessarily tasering him while he lay in his cell.

## II.    Ekonomou's Motion for Summary Judgment (Dkt. No. 47)

### A.    Facts

The plaintiff alleges that Ekonomou was deliberately indifferent to his mental health needs by abruptly taking him off his psychotropic medications, bupropion (Wellbutrin) and quetiapine (Seroquel) on May 2, 2023 while he was housed at Dodge, causing him to experience anxiety, altered mental state, confusion, depression and loss of motor skills. Dkt. No. 49 at ¶2. Ekonomou is a psychiatrist licensed to practice in Wisconsin. Id. at ¶9. Since 2019, Ekonomou has been employed by Array Behavioral, where she provides

psychiatric care via telehealth to incarcerated individuals at Wisconsin Department of Corrections (DOC) facilities. Id. at ¶10.

The DOC maintains a list of prescription and nonprescription medications available for physicians who provide care and treatment at DOC institutions to order; the list is called a "formulary" and any medications not contained within the formulary list are referred to as "non-formulary medications." Id. at ¶14, 15. When an incarcerated individual enters the DOC intake center on psychotropic medications, he is scheduled for a complete psychiatric evaluation with a psychiatrist to review medications; if an incarcerated person is taking a non-formulary medication, the psychiatrist may submit a request to the psychiatric medical director for approval to continue prescribing that medication. Id. at ¶16, 17. The prescription of non-formulary medications must be approved by the psychiatric medical director. Id. at ¶18.

On March 13, 2023, the plaintiff reported on his health intake screening that he was prescribed and taking four psychotropic medications: 60 mg of duloxetine[2] twice daily, 50 mg of hydroxyzine[3] twice daily, 100 mg of Seroquel[4]

_____

[2] Duloxetine (brand name Cymbalta) is a serotonin/norepinephrine reuptake inhibitor (SNRI) which has been approved by the Food and Drug Administration (FDA) to treat major depressive disorder, generalized anxiety disorder, and chronic musculoskeletal pain. Id. at ¶29. It is a formulary medication at the DOC. Id. at ¶32.

[3] Hydroxyzine (brand name Vistaril) is an antihistamine which has been approved by the FDA to treat anxiety but is also commonly used "off label" to treat insomnia due to its sedative effects. Id. at ¶33. Hydroxyzine is a formulary medication at the DOC. Id. at ¶34.

[4] Quetiapine (Seroquel) is an atypical antipsychotic which has been approved by the FDA for the treatment of schizophrenia and bipolar disorder. Id. at ¶35.

once daily, and 150 mg of Wellbutrin[5] once daily. Id. at ¶¶19-20. On April 4, 2023, the plaintiff was seen by Charles Dombeck, APNP, for an intake history and physical. Id. at ¶23. The plaintiff reported that he was taking duloxetine both for chronic pain and for anxiety/depression. Id. at ¶25. Dombeck recommended that the plaintiff continue his duloxetine, but deferred dose management to psychiatry. Id. at ¶26.

Ekonomou had two visits with the plaintiff. Id. at ¶27. On May 2, 2023, Ekonomou saw the plaintiff for a complete psychiatric exam and to review his psychotropic medications with him. Id. at ¶28. The plaintiff explained to Ekonomou that his main complaint for psychiatry was feeling anxious and worried. Id. at ¶46. On examination, Ekonomou found the plaintiff to be awake, alert and oriented. Id. at ¶47. His mood and affect were appropriate, his memory was intact, his speech was normal, he maintained eye contact, his thought process was logical, he was not hallucinating and his insight and judgment were fair. Id. Ekonomou noted that the plaintiff had a history of

---

The average dose of Seroquel to treat schizophrenia or bipolar disorder is between 400-800 mg; the plaintiff was only prescribed 100 mg. Id. at ¶¶36-37. Seroquel is not a medication recommended to treat anxiety or insomnia because its side effects outweigh its benefits and there are better medications available to treat anxiety and insomnia. Id. at ¶39. Seroquel is a non-formulary drug because it is one of the most abused drugs in the prison system. Id. at ¶40.

[5]Bupropion (Wellbutrin) is an atypical antidepressant which has been approved by the FDA for the treatment of major depressive disorder, prevention of major depressive episodes and smoking cessation. Id. at ¶41. Side effects of Wellbutrin include potential increase in suicidal thoughts, dry mouth, nausea, insomnia, agitation, increased blood pressure, and anxiety. Id. at ¶42. Wellbutrin is a non-formulary drug because it is one of the most abused drugs in the prison system. Id. at ¶43.

5

chronic back pain, which worsened his depression, decreased his motivation and made it difficult for him to fall asleep. Id. at ¶45. During their conversation of May 2, 2023, the plaintiff did not disclose to Ekonomou a history of schizophrenia, schizoaffective disorder, major depressive disorder or bipolar disorder. Id. at ¶48. Ekonomou diagnosed the plaintiff with unspecified anxiety disorder and unspecified insomnia disorder. Id. at ¶49. At this visit, the plaintiff had no symptoms or history consistent with bipolar disorder. Id. at ¶61.

As to medications, Ekonomou explained that she would be discontinuing the plaintiff's Wellbutrin prescription for two reasons: 1) it is not a medication used to treat anxiety disorders because it can actually make anxiety worse; and 2) it is a non-formulary medication, meaning there are criteria to prescribe it, which the plaintiff did not meet. Id. at ¶¶50-51. Ekonomou also explained to the plaintiff that she would be discontinuing his Seroquel prescription because it is not a medication used to treat anxiety or insomnia, the risks far outweigh the benefits, it was non-formulary and there were more effective medications available to treat his anxiety and insomnia. Id. at ¶52. To treat his diagnoses of anxiety and insomnia, Ekonomou continued the plaintiff's prescriptions for hydroxyzine and duloxetine, and added a new prescription for mirtazapine[6]. Id.

---

[6] Mirtazapine (brand name Remeron) is an atypical tetracyclic antidepressant approved by the FDA to treat major depressive order and anxiety associated with depressive episodes. Id. at ¶55. Seroquel and mirtazapine are equally effective in treating insomnia, but mirtazapine does not carry the same risks and side effects of Seroquel and has the added benefit of addressing depression and anxiety. Id. at ¶56.

at ¶¶53-54. Ekonomou discussed the risks and benefits of each medication with the plaintiff and emphasized the importance of taking his duloxetine as prescribed to avoid potential withdrawal symptoms. Id. at ¶57. Ekonomou noted that the plaintiff understood her instructions and agreed with the plan. Id. at ¶58.

On May 5, 2023, Ekonomou received a health service request from the plaintiff stating that he had read information about mirtazapine, and to let his doctor know he had bipolar disorder. Id. at ¶59. He said that he forgot to mention his bipolar disorder, which is what his Wellbutrin prescription was for. Id. In response, Ekonomou sent the plaintiff a letter explaining that Wellbutrin is not for bipolar disorder, that it is a non-formulary medication for which he did not meet the criteria and that he could discuss it further at his next follow up visit with her. Id. at ¶60.

On May 12, 2023, Ekonomou received a health service request from the plaintiff saying that mirtazapine was helping his depression but not his anxiety, and he was wondering if he could increase his hydroxyzine or switch to a different medication for anxiety. Id. at ¶62. Ekonomou responded that she and the plaintiff could discuss medication at his upcoming visit and reiterated that he could talk to psychology about his anxiety symptoms. Id. at ¶63. Then, Ekonomou emailed the program medical assistant and asked that the plaintiff be added to her schedule during her next available shift (Tuesday May 16) to discuss his medication issues. Id. at ¶65.

On May 16, 2023, Ekonomou saw the plaintiff for the second and final time to discuss his psychotropic medications. Id. at ¶66. The plaintiff said that he was experiencing increased anxiety and panic attacks due to being in pain and feeling like his pain was not being managed correctly. Id. at ¶67. Ekonomou examined the plaintiff, and found his vitals to be normal, meaning that he was physically calm. Id. at ¶68. Ekonomou did not find the plaintiff's presentation to be consistent with withdrawal symptoms from Seroquel or Wellbutrin, particularly two weeks after the low doses of these medications were discontinued. Id. at ¶75. Ekonomou believed that the plaintiff may have been experiencing "rebound insomnia," or temporary sleeping difficulties, from coming off Seroquel. Id. at ¶69. To address the plaintiff's potential rebound insomnia, as well as his anxiety symptoms, Ekonomou increased his doses of mirtazapine and hydroxyzine, and added a prescription for another medication called clonidine[7]. Id. at ¶¶70-72. Ekonomou also discussed with the plaintiff alternative medications, including Zoloft and buspirone, but the plaintiff was not interested in taking them. Id. at ¶71. The plaintiff agreed with the plan to try increased doses of mirtazapine and hydroxyzine and add clonidine. Id. at ¶¶70, 74. Ekonomou encouraged the plaintiff to talk to psychology regarding coping strategies for his anxiety. Id. at ¶71.

---

[7] Clonidine is a blood pressure medication which also has been found effective in treating anxiety disorders and insomnia because it helps to decrease activity in the sympathetic nervous system and alleviate physical anxiety symptoms. Id. at ¶73.

8

After the May 16 visit, Ekonomou contacted the pharmacy to ensure that the plaintiff received his medications as quickly as possible, and the pharmacist informed her that they would have his medication increased the next morning. Id. at ¶76. The next day, the plaintiff refused to take his mirtazapine and his hydroxyzine, and there is no indication in the medication administration record that he took his morning dose of duloxetine. Id. at ¶¶77-78.

Later on May 17, 2023, Ekonomou received a message from a nurse that the plaintiff had had a major panic attack, and he felt it was because he was withdrawing from Seroquel. Id. at ¶79. The next day, Ekonomou responded that the plaintiff's symptoms reported by the nurse of elevated heart rate, elevated pulse, agitation and irritability were not consistent with Seroquel withdrawal given his prior low dose of 100 mg and given that two weeks had passed since the medication was discontinued. Id. at ¶81. Ekonomou explained she and the plaintiff had discussed that the medication changes from the May 16 appointment would require time to take effect. Id. at ¶82. She also said that she had submitted a non-formulary request for Seroquel per the plaintiff's request, but the plaintiff did not meet the criteria and that she had discussed this with him. Id. at ¶83. Ekonomou's request subsequently was denied by Jeffrey Anders, who stated that "quetiapine is not indicated for anxiety disorders" and that if the plaintiff's current medications were not effective, they next would consider a trial of an SRI or an SNRI from the list of formulary medications. Id. at ¶85. The psychology department informed the nurse that

9

the plaintiff's monitoring level had been changed from low to high, that he had been provided skills to manage his anxiety and that he would be seen by psychology again the next week. Id. at ¶84. There is no indication in the medication administration record that the plaintiff took his evening dose of duloxetine on May 18, 2023, and he refused it on May 19, 2023. Id. at ¶¶80, 87.

On May 19, 2023, at 1:00 a.m., a nurse messaged Ekonomou saying the plaintiff had been evaluated overnight due to another panic attack and that he was complaining about withdrawal from Seroquel and Wellbutrin. Id. at ¶88. This was the last message Ekonomou received regarding any psychiatric issues the plaintiff was having. Id. The plaintiff then was transferred to the restricted housing unit, but Ekonomou was not notified or contacted to see him once he was there. Id. at ¶¶89-91. An on-call psychiatrist, nursing staff, psychology staff and primary care providers were available to see patients on the restricted housing unit as needed, and nursing staff were available on-site. Id. at ¶92.

Over the next three days, the plaintiff continued to refuse his psychotropic medications, including duloxetine, clonidine and mirtazapine on May 20, 2023; duloxetine and his mirtazapine on May 21, 2023; and duloxetine and clonidine on May 22, 2023. Id. at ¶¶93-95. On May 22, 2023, Ekonomou received the message sent to her on May 19, 2023 and responded that she would see the plaintiff the following day. Id. at ¶¶96-98. But the plaintiff was not added to her schedule for May 23, 2023, and instead was

10

transferred to Redgranite Correctional Institution, where Ekonomou no longer was involved in his care. Id.

      B.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

      C.     Discussion

Ekonomou contends that she is entitled to judgment as a matter of law because she was not deliberately indifferent to any serious medical need of the plaintiff. Dkt. No. 50 at 12. She argues that she met or exceeded professional standards in her course of care and treatment for the plaintiff. Id. at 16. Ekonomou also contends that the plaintiff cannot demonstrate that her care and treatment had an objective detrimental effect on him and thus cannot prove causal injury. Id. at 20-22.

To prevail on an Eighth Amendment claim based on deficient medical care, the plaintiff must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble,

11

429 U.S. 97, 105–06 (1976); <u>see also</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). To meet this standard, the plaintiff must make two showings. First, he must demonstrate that he "suffered from an objectively serious medical condition." <u>Petties v. Carter</u>, 836 F.3d 722, 728 (7th Cir. 2016) (citing <u>Farmer</u>, 511 U.S. at 834). Second, he must show that the "individual defendant was deliberately indifferent to that condition." <u>Id.</u> (citing <u>Farmer</u>, 511 U.S. at 834).

It is undisputed that at her first meeting with the plaintiff on May 2, 2023, Ekonomou saw the plaintiff for a complete psychiatric exam and to review his psychotropic medications with him. Based on the exam, Ekonomou diagnosed the plaintiff with anxiety and insomnia. She discontinued his Wellbutrin and Seroquel prescriptions because they were not consistent with his diagnoses and because they are DOC non-formulary medications for which the plaintiff did not meet the criteria. Ekonomou continued hydroxyzine and duloxetine, and added mirtazapine. At the time, the plaintiff agreed with the medication changes, but he subsequently said he wanted to resume Wellbutrin. During Ekonomou's second visit with the plaintiff on May 16, 2023, the plaintiff said he was experiencing increased anxiety and that he was experiencing pain that wasn't being addressed. Ekonomou evaluated the plaintiff's symptoms and medications. To address his anxiety, she increased his mirtazapine and hydroxyzine, and she added clonidine. She said that the plaintiff did not meet the criteria for Seroquel, and that her request for him to have the non-formulary medication was denied.

At summary judgment, the court will assume that the plaintiff had a serious medical need. See Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th Cir. 1996) (psychiatric or psychological disorder may present a "serious medical need). But the plaintiff's disagreement with Ekonomou's treatment decisions does not amount to deliberate indifference. See Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir. 1997). The undisputed facts show that Ekonomou used medical judgment in prescribing medication for the plaintiff, and that she adjusted the medication when the plaintiff described his anxiety and insomnia during their second meeting. See Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008) (if a medical professional exercises some medical judgment, she cannot be found deliberately indifferent); see also Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996) (no deliberate indifference where plaintiff did not show that medical judgment was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment"). A reasonable factfinder could not conclude that Ekonomou violated the plaintiff's constitutional rights, and the court will grant her motion for summary judgment.

III.    **Hartzheim's Motion for Summary Judgment (Dkt. No. 42)**

A.      Facts

Hartzheim was a captain at Dodge during the events described in the complaint. Dkt. No. 44 at ¶2. On May 20, 2023, at 2:20 p.m., Nurse Metz told Hartzheim that she needed to get vitals from the plaintiff. Id. at ¶4. Hartzheim

13

and three officers went to the plaintiff's cell to escort him to the "HSU room." Id. at ¶¶5-6.

As the officers escorted the plaintiff, he stopped walking. Id. at ¶7. The officers told the plaintiff to keep walking, and he stated he couldn't walk and started to lower his body toward the floor. Id. at ¶8. The officers assisted the plaintiff to a standing position to help him walk. Id. at ¶9. The plaintiff took a couple more steps and then said he couldn't walk, needed a wheelchair and was having chest pains. Id. at ¶10. Hartzheim and the officers told the plaintiff that he needed to walk because the nurse was there to see him. Id. at ¶11. The plaintiff reiterated that he needed a wheelchair. Id. at ¶12. The plaintiff was given several verbal directives to stand up and walk the rest of the way. Id. at ¶15. He continued to stay in a kneeling position and yelled that he couldn't walk and needed a wheelchair. Id. at ¶16. There was no wheelchair on the unit. Id. at ¶17. After some time trying to get the plaintiff to walk, Hartzheim and the officers decided to use the restraint chair to escort him the rest of the way. Id. at ¶18.

Once they arrived in the HSU room, Nurse Metz started to assess the plaintiff. Id. at ¶20. The plaintiff did not answer all the questions that Metz asked him, and he kept saying that he needed to go to the hospital because staff weren't helping him. Id. at ¶¶22-23. After assessing the plaintiff, Metz said she wanted to do an EKG. Id. at ¶¶24-25. Nurse Adeyemo came to assist with the EKG. Id. at ¶¶26-27. The nurses had the EKG machine ready, but the plaintiff's shaking made the test difficult to read. Id. at ¶28; Dkt. No. 45-1 at

14

21:00-26:00 (Ex. 1006, Hartzheim's Body-Worn Camera Video Footage). Adeyemo placed a brown paper bag around the plaintiff's mouth to have him breathe in it. Dkt. No. 44 at ¶29. Adeyemo explained to the plaintiff that breathing into the paper bag would help him because he was hyperventilating. Id. at ¶30; Dkt. No. 45-1 at 25:40-25:50. The plaintiff then said that he was in pain, he needed to see a doctor and that Adeyemo was trying to kill him. Dkt. No. 44 at ¶31; Dkt. No. 45-1 at 25:50-26:00. The nurses then decided to stop the EKG. Dkt. No. 44 at ¶32.

Metz told the plaintiff that his vitals were good, and that she would call the doctor and get back to him. Id. at ¶33. The plaintiff reiterated that his heart felt like it was going to explode, that he had chest pain that was going down his left side and that something was wrong. Dkt. 45-1 at 28:00-28:18. Metz said she would call his doctor and get right back to him. Id. at 28:18-28:21. She said she couldn't do the EKG because he was shaking too much. Id. at 28:25-28:30.

Hartzheim and the officers wheeled the plaintiff back to his cell in the restraint chair. Dkt. No. 44 at ¶34; Dkt. No. 45-2 at 28:00-28:40 (Ex. 1007, Officer 181s Body-Worn Camera Video Footage). The officers helped the plaintiff out of the restraint chair and to his feet. Dkt. No. 44 at ¶35. The tether was applied, and the Velcro ankle restraints were removed. Id. at ¶36. The plaintiff started lowering his body and weight to the floor and said that he couldn't stand up because his leg wasn't working. Id. at ¶37. Hartzheim and the officers explained to the plaintiff that they needed to get the waist belt and

15

handcuffs off him. Id. at ¶40. The officers helped the plaintiff to a standing position, and Hartzheim removed the waist belt. Id. at ¶42. Hartzheim and the officers helped the plaintiff step into his cell, but he continued to refuse to stand by lowering his weight and leaning to the side. Id. at ¶43. The plaintiff said he couldn't stand up. Dkt. No. 45-1 at 30:30-31:50.

The officers sat the plaintiff on the corner of the bed closest to the door, but he would lean to the side—not sit up straight—and fall over. Dkt. No. 44 at ¶44; Dkt. No. 45-2 at 32:00-32:10; Dkt. No. 45-1 at 32:30-33:10. Hartzheim and the officers helped the plaintiff to a seated position and instructed him to sit there, but he kept falling over to the side. Dkt. No. 44 at ¶45. Hartzheim told the plaintiff multiple times that he needed to plant his feet down so that he could stand and they could get the restraints off him. Dkt. No. 45-2 at 33:40-34:15; Dkt. No. 45-1 at 34:15-35:15. While sitting on the bed, the plaintiff slumped to his left and an officer pulled him back to an upright seated position. Dkt. No. 45-2 at 34:15-34:31; Dkt. No. 45-1 at 35:25-35:35. Hartzheim unholstered her Taser, pointed it at the plaintiff and said that he needed to sit up at the end of his bed or she would tase him. Dkt. No. 45-2 at 34:30-34:45; Dkt. No. 45-1 at 35:40-35:50. She asked if he understood her, said he needed to sit at the end of the bed so the restraints could be removed and said that he had been medically cleared. Dkt. No. 45-2 at 34:45-34:55; Dkt. No. 45-1 at 35:50-36:05. The plaintiff leaned toward his left side and fell onto the floor at the end of the bed; Hartzheim said, "now you're being resistive." Dkt. No. 45-2 at 34:55-35:05; Dkt. No. 45-1 at 36:05-36:15. As the

16

plaintiff lay on the floor, not moving, Hartzheim and an officer instructed the plaintiff to stand up; Hartzheim had her Taser pressed against the plaintiff's upper right thigh. Dkt. No. 45-2 at 35:05-35:10; Dkt. No. 45-1 at 36:10-36:20. Hartzheim yelled at the plaintiff to stand up and asked him several times if he was going to cooperate. Dkt. No. 45-2 at 35:10-35:25; Dkt No. 45-1 at 36:20-36:30. Hartzheim then said, "one, two, three, Taser, Taser, Taser" and tased the plaintiff on his outer and inner upper thigh as the plaintiff screamed out in pain. Dkt. No. 45-2 at 35:27-35:36; Dkt. No. 45-1 at 36:30-36:38. Hartzheim yelled at the plaintiff to stand up and an officer asked the plaintiff if he was going to stand up; the plaintiff replied that he couldn't stand up and he couldn't move his left side. Dkt. No. 45-2 at 35:36-36:46; Dkt. No. 45-1 at 36:38-36:56. Officers assisted the plaintiff to a seated position and then to a standing position, holding him up while the restraints were removed. Dkt. No. 45-2 at 35:46-39:50.

During the incident on May 20, 2023, Hartzheim gave the plaintiff multiple directives to stand or sit on the bed, where he could be secured with the tether. Dkt. No. 44 at ¶78. Hartzheim believed that the plaintiff had the ability to comply with these directives because, among other things, he had just been cleared to return to his cell by the HSU without any physical restrictions noted, Hartzheim saw him walk part of the way to the HSU, Hartzheim saw him "gesticulating" and she saw and felt him resist moving his legs when staff attempted to move them. Id. at ¶79. Hartzheim perceived that the plaintiff was deploying deadweight tactics to avoid complying with her

17

directives. <u>Id.</u> at ¶80. That is, she perceived that he was refusing to sit or stand for the tether to be secured and was requiring staff to physically hold him upright. <u>Id.</u>

Hartzheim has been trained in different techniques to enforce compliance. <u>Id.</u> at ¶86. Some of the most common techniques include use of a Taser, OC spray or compliance holds. <u>Id.</u> at ¶87. Hartzheim does not believe OC spray would have been appropriate because she was so close to the plaintiff that the spray could have damaged his eyes, and because it could have affected other officers standing nearby. <u>Id.</u> at ¶88. Hartzheim does not believe a compliance hold would have been appropriate because it would have required an officer to maintain physical contact with the plaintiff, which would not have allowed staff to shut the cell door. <u>Id.</u> at ¶89. At the time, Hartzheim believed that use of the Taser was an appropriate compliance technique to allow staff to finish securing the plaintiff in the cell. <u>Id.</u> at ¶90. Hartzheim believed that the use of the taser was effective, because the plaintiff subsequently complied enough for staff to close the cell door. <u>Id.</u> at ¶91.

B.     <u>Discussion</u>

Hartzheim contends that she is entitled to summary judgment because she did not use excessive force against the plaintiff but, rather, acted in a good faith effort to secure the plaintiff in his cell. Dkt. No. 43 at 3. Hartzheim also contends that she is entitled to qualified immunity. <u>Id.</u>

The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits "unnecessary and wanton infliction of pain" on incarcerated

18

individuals. <u>Hudson v. McMillian</u>, 503 U.S. 1, 5 (1992). In cases involving the use of excessive force, the question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Id.</u> at 7. Factors for courts to consider in determining whether the use of force was wanton and unnecessary include "the need for an application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" <u>Id.</u> (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986)).

Hartzheim states that, given the plaintiff's refusal to stand or sit by the door and his use of deadweight tactics to avoid compliance, she had to use force to secure him in his cell. Dkt. No. 43 at 4. She also states that she had limited options for restoring compliance and that a short application of the Taser was her only viable option. <u>Id.</u> Regarding the extent of injury, Hartzheim states that she applied the Taser for just a few seconds and the sole reasonable inference is that the plaintiff suffered only a minor injury during the Taser application. <u>Id.</u> at 4-5. Hartzheim states that she had a strong interest in enforcing institution rules and discipline, and that the plaintiff's refusal to sit or stand placed institution discipline in jeopardy and used scarce staff resources. <u>Id.</u> at 5. She asserts that she "gave [the plaintiff] dozens of directives over several minutes to comply before using the taser, as did multiple other officers," which shows that she made every effort to temper the use of force. <u>Id.</u> at 5-6.

19

When prison officials face aggression, disruption or physical threats from incarcerated individual, "compelling compliance with an order is a valid penological justification for use of a taser." Lewis v. Downey, 581 F.3d 467, 477 (7th Cir. 2009). A prison official's use of a Taser in these and other circumstances can be a "good faith effort to maintain or restore discipline within the [prison]." See Forrest v. Prine, 620 F.3d 739, 747 (7th Cir. 2010); cf. Lewis, 581 F.3d at 478 (recognizing that "any number of scenarios" could justify the use of a taser in the penal context).

Hartzheim avers that she tased the plaintiff because he continually refused to comply with orders to sit or stand up. She says that she believed that he was disobeying orders and applying deadweight tactics to prevent being placed back in his cell. But the videos that Hartzheim submitted of the incident, support another theory: that the plaintiff *could not* get up by himself and that Hartzheim tasered him while he lay on the floor in his cell *unable* to get up. The video footage supporting this version includes segments calling into question whether the plaintiff was able to walk all the way to the HSU; it shows that while he was in the HSU, nurses were unable to perform an EKG because of the plaintiff's shaking; it shows that the plaintiff complained that he was in pain, that his chest and left side hurt and that he needed to see a doctor; the plaintiff appears slumped over to his left side while sitting in the restraint chair; before the plaintiff returned to his cell, the nurse said she would contact a doctor right away and get back to him; and Hartzheim and the officers *wheeled* the plaintiff back to his cell—he did not walk. Once he was back at his

20

cell, the plaintiff consistently said that he could not stand up, and his physical appearance supports this. Officers dragged or shuffled him to the bed and held him upright. Hartzheim grew increasingly frustrated with the plaintiff's failure to support himself, and she held out a Taser and warned him that if he didn't sit up, she would taser him. The plaintiff fell to the ground and seconds later, while laying on the ground, Hartzheim tasered the plaintiff. The plaintiff screamed in pain after being tasered, but he did not sit up on his bed or stand up. Officers lifted him up and supported him in a standing position while his restraints were removed. Although once the cell door was closed the plaintiff is not visible, it appears from the location of the tether and the angles from which officers were looking into the cell that the plaintiff remained on the ground after the cell door closed.

If, based on his medical condition, the plaintiff couldn't support himself sitting or standing, then Hartzheim's use of a Taser on him was excessive. It also was unnecessary because Hartzheim and the officers could have removed his restraints while supporting him, which is what they did after Hartzheim tasered him. The plaintiff does not appear to have posed a physical threat to Hartzheim or the officers. Deploying a Taser on him under such circumstances would not constitute an attempt to maintain or restore discipline. A reasonable factfinder could conclude that Hartzheim's use of a Taser on the plaintiff while he lay on the ground unable to get up violated his rights under the Eighth Amendment. See Lewis, 581 F.3d at 477 (a genuine issue of material fact existed as to whether an officer's use of taser on an incarcerated individual

lying in a bed was intended as a good faith effort to maintain order or was excessive).

Hartzheim contends that she is entitled to qualified immunity because the plaintiff "can point to no authority allowing an excessive force claim where an officer employed a taser when an inmate employed deadweight tactics to avoid being secured in his cell." Dkt. No. 43 at 7-8. Qualified immunity "protects government officials from suit for damages when their conduct does not violate clearly established statutory or constitutional rights." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Determining whether a state official is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." Williams v. City of Chicago, 733 F.3d 749, 758 (7th Cir. 2013). If either inquiry can be answered in the negative, the official is entitled to summary judgment.

A constitutional right is clearly established if "the right in question [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Lindell v. Pollard, 558 F. Supp. 3d 734, 744 (E.D. Wis. 2021) (quoting Weinmann v. McClone, 787 F.3d 444, 450 (7th Cir. 2015)). "[T]he clearly established right must be defined with specificity." Id. (citing City of Escondido v. Emmons, 586 U.S. 38, 42 (2019)). The court should "analyze whether precedent squarely governs the facts at issue, mindful that [courts]

22

cannot define clearly established law at too high a level of generality." Id. at 744-45 (quoting Strand v. Minchuk, 910 F.3d 909, 917 (7th Cir. 2018)).

Hartzheim says that she is entitled to qualified immunity based on her assertion that the plaintiff was employing deadweight tactics to avoid being secured in his cell. But as the court has explained, the videos of the incident allow for an inference that the plaintiff could not sit or stand on his own, as he told Hartzheim and the officers. If the plaintiff couldn't get up on his own after he fell to the ground, a reasonable factfinder could conclude that Hartzheim's use of a Taser on the plaintiff while he passively lay on the ground amounted to excessive force, in violation of clearly established law. See Lewis, 581 F.3d at 478-79 (denying qualified immunity to officers who applied a Taser to an incarcerated individual lying on his bed in a weakened state, in response to his refusal of an order to get out of bed); see also Hendrickson v. Cooper, 589 F.3d 887, 891 (7th Cir. 2009) (holding that an incarcerated individual's constitutional rights are violated where correctional officers use physical force when the individual poses no threat). Hartzheim has not demonstrated that she is entitled to qualified immunity, and the court will deny her motion for summary judgment.

## IV.    Notice to Plaintiff

Because the plaintiff did not respond to the defendants' motions for summary judgment, it appears that he no longer wants to proceed with this case. The court will give the plaintiff a short time to notify the court that he wants to proceed with his claim against Hartzheim. If he does not notify the

23

court by the deadline the court sets below, the court will dismiss this case with prejudice for lack of diligence. <u>See</u> Civil Local Rule 41(c) (E.D. Wis.).

## V.     Conclusion

The court **DENIES** defendant Hartzheim's motion for summary judgment. Dkt. No. 42.

The court **GRANTS** defendant Ekonomou's motion for summary judgment. Dkt. No. 47. The court **DISMISSES** defendant Ekonomou.

The court **ORDERS** that if the plaintiff wants to proceed with his excessive force claim against Hartzheim, then by the end of the day on **July 17, 2026**, he must send to the court a written document stating that he wants to proceed. If the plaintiff does not notify the court by the end of the day on July 17, 2026 that he wants to proceed, the court will dismiss the case with prejudice for the plaintiff's failure to diligently prosecute it.

Dated in Milwaukee, Wisconsin this 29th day of June, 2026.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**Chief United States District Judge**